2024-13-14. Mr. Selinger. Mr. Hill. No, I'm Mr. Hill, right. May it please the court. In this case, the appellants are asking the court to reverse the finding of the lower court that there was constructive knowledge here for a number of legal errors. The first being under the doctrine of inquiry notice. The doctrine of inquiry notice says that one learns facts that would lead a person to inquire further but fails to do so is charged with constructive knowledge of the facts that a reasonable inquiry would have revealed. In the opinion below, the court acknowledged that further inquiry would not have revealed the buyer's plans. Nonetheless, the claims court held that inquiry knowledge was satisfied by indicators of potential fraud and a refusal to ask further questions, irrespective of whether the plans would have been admitted. New York law is clear that you're only charged with knowledge which a reasonable inquiry would have revealed. The buyer was a fraudster who lied even to his own counsel. He made warranties, contractual warranties that he immediately breached given this pattern of deception. It doesn't follow from the fact that even if we all agree the fraudster himself wasn't going to tell you he was about to engage in fraud, how does it follow that you therefore, your client has no obligation to ask any questions or do any due diligence at all? Well, in fact, Judge Stark, there were questions asked and there was significant due diligence that was actually done. The record shows that the counsel, the esteemed counsel, tax counsel, M&A counsel, reviewed many transactions before this, rejected them, rejected dealings with certain firms like BDO because he thought they were aggressive. We're reviewing a trial record and findings by a trial court. What if any facts that the trial court relied on to rule against you are clearly erroneous and therefore we shouldn't credit them? The due diligence that was done included representations and warranties which are the best form of due diligence because unlike talking to somebody who they tell you something, warranties impact future conduct. The warranties here prevented the buyer from selling substantially all of the assets and that would have... I thought they modified that so that they only agreed to retain substantial assets. Correct. They agreed to retain substantial assets. The testimony from the tax partner was substantial assets would have been in the range of 40% of the assets, but they didn't maintain substantial assets, they immediately sold them. So any negotiations that they had, any information they had, they would have been defrauded. There was nothing that raised the suspicion of the partners because everything was customary and the red flags that were supposedly shown were not even yellow flags. The buyer as a new entity, how could it possibly have had relevant tax attributes which seems to have been an assumption that the buyer made that the seller would only be interested at this price level if it had those relevant tax attributes? How could a new entity even possibly have them? Well, in fact, it would have been unusual if an SPV was not involved in the transaction. The testimony was clear that 95% of M&A transactions have SPVs. I get that, but how about those net operating losses? How could a new SPV have had those? The new SPV would not necessarily have them, but Mr. Bambino testified that there were a number of potential transactions that he was familiar with that were in the marketplace that he had dealt with that could have been done. Nothing raised a particular suspicion. There were partnership freezes, there were S-corp conversions, there were tax credit deals, there were potential mergers. This was a very sophisticated M&A tax person who was familiar with all of these transactions and was an expert in the field, as was the M&A corporate partner who also testified that he saw nothing that was unusual about the transaction. How does that show that the trial judge's finding that this was a red flag, how does it show that it was clearly erroneous? Well, I think, first of all, it's a legal question that if inquiry would not have revealed the issue, any problems, you're not charged with inquiry knowledge under New York law. The other issue is whether . . . So, in other words, you don't think, so Judge Brugink found that the fact that the entity was new and how could it have had net operating losses, that that was a red flag. You don't dispute that fact finding? No, I do dispute it because it was . . . So, how is it clearly erroneous? What is your argument for why it's clearly erroneous? The standard is legally erroneous because if you cannot discover the issue and the judge admitted they wouldn't have discovered the issue, you can't be held with inquiry notice. Otherwise, you have active avoidance and there was no active avoidance. You have to take steps to avoid learning the facts. There were no steps here taken to avoid learning the facts. Those are legal errors, but it was clear in the marketplace and to a sophisticated tax practitioner that there were many opportunities . . . Your view is that it's clearly erroneous because there were things that could have been done to create those net operating losses. There were things that could have been done and the Taxpayers Council understood that and there were no active steps to avoid it and New York law does not require the seller in this case to do an audit of the taxpayer's tax planning. His state of mind was that there were plenty of things to do and he had experience with that and our expert who testified who was an M&A expert, a Harvard law professor, written books on it, Fortune 500 Corporation Director testified that this was all commonplace. There were at least three experts that testified extensively at trial and the trial court goes through their testimony pretty rigorously. It seems possible but irrelevant that the trial court could have come out your way, but what do we do with the extensive findings? For instance, if you want to focus on one, there's no economically rational reason for anyone to show up at this auction and pay 95% of the fair market value. That's a finding of fact based on extensive expert testimony. Don't we have to accept it? No, it's erroneous for a number of reasons. First of all, the appellees' experts were not lawyers, were not experts on auctions, due diligence or M&A transactions. They've never been involved in them. That's number one. Number two, despite the court So are you questioning whether the court below could credit that testimony? I'm saying that the testimony should not have been credited, but the testimony we provided was all of M&A experts and people in the field that do this all the time. The appellate judges don't do that, right? No, we're talking about the legal standards here. Can I answer Judge Stark's other question? While the court believed no rational actor would bid more than around 71% of the asset's market value, the reinvestment firms bid far excess of that, plus an offer from Citibank in the 80s. But the claims court ignored Deutsche Bank's offer to pay 86% of the asset's value, which was above that threshold. And the undisputed record showed that Deutsche Bank planned a vanilla hedging transaction, not fraud. So the finding of this economics is just clearly erroneous. Even a second circuit that the government cites, Eisenberg, explains that where there's a relatively sizable number of potential buyers can avoid or defer the tax, the fair market value of the shares might well approach the pre-tax market value of the entity's underlying assets. I want to turn to the issue of the interest. And we believe that the IRS clearly abused its discretion here. And all you need to do is to look at the language of the statute itself. Congress clearly, under Section 6603 of the Internal Revenue Code, said you can make deposits to suspend the running of interest on potential underpayments. But not necessarily for another entity, right? Well, yes. A taxpayer may make a deposit with the secretary which may be used. It says may be used because you can get the deposit back as you want. Under a shall be used, if it said a taxpayer may make a cash deposit which shall be used by the secretary, the statute would be a nullity. It wouldn't be a deposit. It would be a tax payment. You wouldn't be able to get it back. The IRS is arguing that that's a significant difference because you retained the right at any time to ask for the deposit back. They were within their discretion to not attribute it to the taxes ultimately as you wanted. Isn't that at least a reasonable approach by them? That's not a reasonable approach because Supreme Court law says you can apply a tax to any taxpayer. And in fact, in this case, the deposit was later, the tax was paid to the very entity that the deposit was made for. So it's a distinction without it. You said it is an abuse of discretion. Do we have to find it's an abuse of discretion for you to prevail on the interest issue? Is it a question of law or is it a question of their discretion? Well, to the extent that it was claimed to be their discretion, it's an abuse of discretion. As a matter of law, the statute clearly provides for this. The law clearly provides for this. And the fact that there's a different EIN is a distinction without a difference. Don't you think, I mean, the better legal approach to this is that it's an abuse of discretion standard? The reason why I say it is because it says which may be used. And there's no interest. Yes, I do. And I think I understand and have empathy for the situation that it would have been much better had they used it. But there is a great amount of discretion, it seems to be. There's there's really no discretion because the whole purpose is to stop the running of interest. And here the deposit was made. The deposit was held by the government in a general account. No interest was paid. It wasn't returned to say we can't we can't use the deposit. And there's not they can't just arbitrarily decide not to use the deposit to pay the tax. That's the whole purpose of the statute. That's the whole purpose of Congress's intent to do it. And they can't have two similarly situated taxpayers and say to one, OK, we're going to apply this and another we're not. It says any to the extent any taxpayer can pay it right in right in the statute. What about the Part C, 6603C about returning the deposit? That's only in the case of Jeopardy where there's a Jeopardy assessment, which was not here. OK, just quickly on the penalty argument. Is that a question of law or a question of fact that we're reviewing? You don't like the $10 million penalty. Is that a fact question or a legal question? It's a legal question. The New York law says that a future creditor in order, you know, in order to recover has you have to show intent to defraud. And that was not shown here. There was no intent. There was no effort to show that. There was no intent to defraud at the first two steps. If you lost on the first issue, there's not an intent to defraud for the third step. The government did not even argue there was an intent to defraud the government or on behalf of HABER. And it's clearly a future creditor because it's a completely separate year and a completely separate transaction. It does not relate to the stock sale or even the asset sale. Mr. Hill, I realize I'm confused about your last answer to my question about 6603C. And you said that only applies when the tax is in jeopardy. But it says actually, except in the case where there's jeopardy, the secretary shall return any amount which the taxpayer requests and writes. Yes, they, the statute provides that you can request a deposit back if you don't want to apply it as a payment, except you can't get it back if there's a jeopardy situation. So in any situation where I post a deposit, I'm entitled under the statute to get it back. But I'm also entitled under the statute to have it applied to any tax.  I'm sorry? Was there any attempt to get it back? When they abused the discretion by not applying the deposit as a payment, we requested it back and we got it after we filed the mandamus action. It's supposed to be given back anyway. But you know, they, so we did get it back, but we wanted it applied and we had to get it back because there was about $70 million in tax we had to pay. Counsel, you've consumed all of your time, but you are answering questions, so we'll give you two minutes for rebuttal. Thank you, Your Honor. Mr. Klimas. May it please the Court, Jeff Klimas for the United States. The evidence presented at trial fully supports the Court of Federal Claims' decision to collapse the relevant two transactions. One, the Dillon Trust sale of the stock of Humboldt & Shelby to HSHC. And two, HSHC's immediate sale of Humboldt & Shelby's appreciated assets. And when those transactions are collapsed, it renders this a fraudulent conveyance under New York law. In other words, the transactions were, in substance, a liquidation of Humboldt & Shelby with the gross proceeds distributed to their shareholders, the Dillon Trust, while leaving the company's taxes, penalties, and interests unpaid. The standard for constructive knowledge, as articulated by the Second Circuit in HPE leasing, this is page 637 of the opinion, is that the transferee had information sufficient to alert it to the danger that creditors would not be paid, at which point the transferee has a duty to undertake a reasonably diligent inquiry to find out. A failure to undertake that diligent inquiry under those circumstances constitutes a conscious turning away or act of avoidance which is sufficient to collapse the transactions and impose constructive knowledge. One of the striking facts here, to me at least, is they have this auction and at least three offers come in at values that I think are above what the trial court and the government think would be the fair market value if you truly account for the tax liability. And I don't know that there's any evidence about the second or the third offer having any fraudulent components to them. Doesn't that really undermine the findings of the trial court here, that what was going on here was so clearly fraudulent that the trusts were on notice, essentially? You know, we think that there are a number of red flags and that was one of them. The fact, so if you look at... This I guess is akin to a green flag. I hold an auction and three people show up and offer me a price that is consistent with me selling something that is, you know, adequately accounting for the taxes that would have to be paid. Sure. And the trust reason for holding an auction and using that method was they said they wanted to find bidders with the appropriate tax attributes, but if that was really their goal, it's not reflecting the way they structured this auction. If that's actually the goal, they should have, on the front end or the back end, asked for an attestation that there actually were such tax attributes and subsubstantiation thereof. They didn't do that on the front end and they didn't do that on the back end. Now, it's also important that the bid that they ultimately accepted from HSHC is from, as Your Honor pointed out, a newly formed entity and an entity without any ongoing operations. So it had neither tax attributes that it could bring to the table to offset those liabilities or the ability to generate such tax attributes on its own. Under those circumstances, you would say something's going on here if they're bidding 95 percent of the face value of these assets without taking an appropriate discount for the embedded tax liabilities. And if you look at what the Second Circuit said in Diebold, it said it would be the very rare case, indeed, where a purchasing party would assume such liability without an appropriate discount in the sale price. And what the Second Circuit said in Eisenberg is that the impact, and this is at note 15 to 16 of the opinion, is the impact of embedded tax liabilities on fair market value is a factual question that must be determined in light of all the relevant circumstances. Here the relevant circumstances show that there was no way for HSHC, at a minimum, to take into account those embedded tax liabilities. We know even less about TranStar because there's nothing in the record and there was no due diligence done whatsoever on how it would absorb those tax liabilities. Now Deutsche Bank is a little bit of a different situation. We think as a matter of proper due diligence it would have been incumbent upon the trust to do some measure of due diligence and say how is it that you're going to be absorbing these tax liabilities such that you're getting a 15 percent discount. But if you were to come up with a situation where you'd say maybe less due diligence is required, it'd be in the context of a bidder like Deutsche Bank or like Citibank, someone who's in the financial services industry and is by the nature of their business gobbling up different kinds of assets, different kinds of financial instruments, different kinds of security such you could say, they probably got a portfolio such that they could absorb those tax liabilities in some way. We still think you should ask the question. We still think you should probe a little bit further. But that's very different. And if you look at the Alterman decision, it's footnote 69, it says that that case was different because there was an ongoing business that had a plan for how it would absorb the tax liabilities. That's one of the reasons why the Altermans did not get hit with transfer liability. It was not ultimately sustained. But it contrasts that with cases like Diebold or cases like this case where there's not an ongoing business, where it's a newly formed entity that brings new tax attributes to the  That was a red flag that required further due diligence. And that was not done. They simply took the bidder at his word, this is proprietary, this is secret, you don't get to see beyond what that is. There was no follow-up question saying, hey, at a minimum, can you tell us what you're going to do to deal with the tax liabilities? At a minimum, can you tell us what other assets you might have? Hey, we see that you're borrowing the entire purchase price for these companies from Rabobank. Can you give us the underlying bank documents to see what is the security? If we agree with the trial court, you call it an aside, but the trial court says, even if they had asked questions, they were never going to find out about the fraud. If we agree with that, does that have any impact on the right disposition of this case? No, Your Honor, because if you look at the Fourth Circuit's decision, citing and explaining what the Second Circuit was doing in Diebold, they say it's not a question of finding out the minute details of the plan to avoid taxes. It's that you have actual or constructive knowledge that there's a plan not to pay the  taxes. It doesn't matter if they would have found out that HSHC was going to run us on a boss tax shelter, or if they were going to stack the money in pallets and ship it off to the Cayman Islands. It's a question of whether they would have found out that the taxes wouldn't be paid. And the facts that a diligent inquiry would have revealed, the facts they actually got really, really close to finding out without doing any due diligence at all, was that there was no possible way for HSHC to absorb these tax liabilities. No way they were getting paid. And their failure to inquire further on those facts, on the presence of multiple red flags, we would say constitutes conscious turning away, active avoidance. In fact, Brother Counsel mentioned that they walked away from BDO Seidman because they said, we didn't want to do business with a tax shelter promoter. But they didn't do any due diligence to find out whether DGI was, in fact, a tax shelter promoter. It was publicly available information at that time that, in fact, it was under an IRS investigation, that DGI was under an active IRS investigation for promoting tax shelters. If that's really what their concern was in walking away from BDO, they should have walked away from this transaction, too, particularly when they were secretive about their plans and what they were intending to do, and there were no follow-up questions. This is a factual finding at 47 to 49 of the appendix, that their failure to do due diligence under those circumstances, with the presence of so many red flags, was either monumental naivete, gross negligence, or useful fig leaf. And then the court says, we find it was a useful fig leaf, based on our analysis of the witnesses and the evidence produced at trial. That is not clearly erroneous. Let me ask you about the penalty, $10.25 million, I think.  In order to uphold that, do we have to find that there's substantial evidence to collapse the son-of-boss tax fraud by HABER or HSHC, which I think was only culminated something like 18 months after the closing of the stock sale that started this? Do we have to find that all of that was part of a single collapsed transaction? No, Your Honor. We think that the correct analysis is the analysis that was done by the Ninth Circuit in Tricorici, following the First Circuit in Shissel, which is you start with the question of what is a creditor, who has a claim under state law. So we look at Section 270 of the New York Uniform Fraudulent Companions Act, which broadly defines creditors who include a person having any claim, whether unmatured, unliquidated, or contingent. And then we say, well, now we have to turn to federal law and say, what is the nature of the underlying claim for penalties here? And what courts have done, the majority of courts, with the exception of the Eighth Circuit, have said that this is a unitary claim for taxes, penalties, and interest, and they don't break it apart and say, well, the United States is a present creditor as to one, a future creditor as to the others. They say it's a unitary claim that arises and relates back to the date of the transaction. But there was a way for HABER or HSHC, I forget who was supposed to pay the taxes, there was a way that they could put aside, I know they didn't have the financial means to pay it, but they could have avoided that $10 million penalty by doing something appropriate with respect to their tax liability at that point, correct? If they hadn't paid the liability, they would have incurred some kind of penalty, right? There'd be a nonpayment type of penalty. It would necessarily have been the 40% penalty that ultimately...  So I guess I'm just having a hard time understanding why all of that payment, which required an extra bad act, to put it in simple terms, by somebody outside the control of the seller, goes back all the way to the seller. It's certainly not, and so we would make two points. The first of which is that when the Dillon Trust saw these red flags, which at this point are not merely waving, but they are screaming, that there is no way for these tax liabilities to be paid. Now, they didn't know how, but they knew that they weren't going to get paid. And they, at that point, are just, they're going to notice that something's going to happen that causes the tax liabilities not to be paid, and therefore they were excited about accepting the risk that there could be penalties that went along with that, whether they're nonpayment penalties, whether they're negligence penalties, whether they're gross misvaluation penalties, they knew that there were going to be penalties that follow along with that. That was a risk that they were accepting when they did no due diligence in the face of so many red flags. But alternatively, we've also said that, as Borla Council concedes, if this was an actual fraud case, if there'd been a finding under 276 of actual fraud by HSHC, then you could have liability imposed against the transferee for future creditors as well as present creditors. And the District Court didn't reach, or the Court of Federal Claims, rather, did not reach that argument, but certainly that would be something that the Court could look at if the case were remanded. We did present, at 5435 to 5436 of the appendix, we did present an actual fraud argument, the Court erroneously- Actual fraud by HSHC, you didn't present actual fraud evidence against the trust, correct?  We did not make an actual fraud argument against the trust because that's not an element of a fraudulent transfer claim. Certainly though, the Court, in rejecting the 278-2 affirmative defense, did look to badges of fraud that were exhibited on behalf of the transferee, on behalf of the Dillon Trust, and we would submit that those badges of fraud, and there's multiple badges of fraud, the confluence thereof, normally is conclusive evidence as to actual fraudulent intent, which would go to the transferee as well as the transferor. How about on the interest issue? You write at the red brief, 63-64, that they waived by their course of conduct the argument that the IRS didn't have discretion to use this interest, or to use the deposit to pay the successor trust, and I understand the conduct you're pointing to is their request for the return of the deposit. They say they only requested that after you all abused your discretion and made it clear you weren't doing what they wanted with the deposit. Is there evidence on this, and if so, where is the evidence to help understand what really happened here? So, Your Honor, that's the correct timing. They requested that the IRS take the successor trust's deposits and apply them to the original trust's tax liabilities, and the IRS said, no, we're not going to do that, we don't have any guidance on this issue, we're not even sure that you, attorneys for the successor trust, have the authority to do this, on behalf of the original trust, again, no guidance, we don't know exactly how this is all going to game out in terms of the law, because we've never seen this before, we've never done this before. At that point, the successor trust said, we want our deposits back, and they don't just say it, as brother counsel referenced, they actually file a mandamus action saying, give us the money back, at which point the IRS can't do anything else. It'd be one thing if they filed a mandamus action asking for the deposits to be converted to payments, or an APA suit saying there's an abuse of discretion in the IRS as an equitable matter, as a matter of non-monetary relief, we need to move these deposits on behalf of the successors over into payments on behalf of the original trust. They didn't do that, they said, we want the money back. At that point, the IRS can't do anything because it's a shall statute, it's a command. At that point, the IRS has to give money back, and although they don't point it out in their opening brief, the IRS paid interest, the IRS was required to pay interest, and did pay interest. But it was less than the interest that accrued on the tax liability, right? Absolutely, your honor, yes. It's an unusual situation, and it's a situation that I frankly can't really understand. I've been doing tax controversy work at the Department of Justice for over 17 years. I've never seen someone get a notice of transfer liability on behalf of one taxpayer, and then make a deposit on behalf of another taxpayer, and expect that there's going to be an assessment made against the original taxpayer, or against taxpayer number one, but then have the deposit applied, made by taxpayer two, applied to taxpayer one. I've never seen that before. It's really unusual. I'm not entirely sure what the motivation for doing that was, but certainly, if I were in the position of brother counsel, I would have called the IRS and asked, hey, I'm going to do something that I've never done before, that there's no guidance about. You say they chose not to consult with the IRS. Do we have evidence of that, or is that undisputed? I don't think there's any dispute. If they had evidence that they consulted about the impact of making a deposit on behalf of the successors, as opposed to the original trustees, there would certainly be on the record, and there's no evidence of that. In fact, they could have, in fact, cured this issue. Had they just, they say at page 25 of the reply brief, they say the taxpayer knew that the IRS would ultimately assess the successor trust with the original trust tax liabilities. They could have just left the money with the IRS, knowing that would eventually happen, and then the IRS would have taken that deposit by the successor trust, and applied it to the liability of the successor trust, which would have cured this issue. We wouldn't be here arguing about this particular issue. They chose not to do that, and now they're stuck with the consequences of that, regardless of what they may have thought. And we note, finally, that they say that there was a risk of collection. They were concerned about collection. The notices of collection were going and directed at the original trust, which the plaintiffs say had no assets and were defunct. There should be no concern about the lack of assets, or about the collection against defunct assetless original trust, when, in fact, that's what they say was motivating their decision. I see my time has expired. Thank you, counsel. Thank you. Mr. Hill has some rebuttal time, two minutes. Thank you, Your Honor. As a matter of fact, the deposits were made by the successor trust because the original trust had been dissolved. The government was informed of that. The government, under its own guidance, should have made the notices of a liability against the successor trust. There were numerous communications on the record with the revenue agent involved about this. He was told, he told us originally that they would utilize the deposits. Is the basis in our record? It's in the record on appeal. Is it in the appendix? Not in the appendix, no. But regardless, the statute says that the deposit may be used by the secretary to pay any tax, and it should have. And so, and to say that we should have waited or we should have done this with a mandamus, they were hitting us with notices of liability, and we had to pay, you know, pay the tax. So that's why we did it. They were holding back on us. They're supposed to give us the money back right away. We only requested it because they wouldn't apply it, and they just left it sitting in a general ledger. Let's talk about the due diligence. There was nothing publicly available. The case they cite for the investigation was not on PACER. It was not publicly available at the time, but also it was after the due diligence was done, in between the due diligence was done and that. Plus, the case they cite involving Diversified, which said nothing, but what it did say was that Haber was suing a law firm to protect his proprietary strategies. Haber made that public. Tax professionals, accounting firms, law firms, anybody who had a tax strategy kept it proprietary. When you merge with another company, and if you asked, you know, General Motors, what do you intend to do with this, they'd say it's none of your business. So to say it's proprietary was not a red flag, and he actually had filed suit to protect his proprietary strategies.